

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

———————————

No. 2:19-cr-8

———————————

UNITED STATES OF AMERICA,

v.

DANA PENNEY,

Defendant

———————————

## MEMORANDUM OPINION

———————————

### J. Nicholas Ranjan, United States District Judge

Defendant Dana Penney, along with 45 co-defendants, is charged with conspiring to distribute and possess with the intent to distribute a variety of Schedule I, II, and III controlled substances.  Unlike many of his co-defendants, however, Mr. Penney faces two additional charges—one for possession with the intent to distribute controlled substances and the other a related gun charge.  These other two charges stem from a state prosecution later adopted by the government.

Mr. Penney now moves to dismiss the charges against him.  He argues that delay in the return of the superseding indictment violated his rights under the Sixth Amendment and the Speedy Trial Act.  Mr. Penney's argument hinges on this Court adopting the so-called "ruse exception" (which the Third Circuit has not yet adopted) and finding that the sole purpose of his state arrest was to

facilitate his federal prosecution.  According to Mr. Penney, if his arrest were merely a ruse, it should be converted to a federal arrest and the superseding indictment (which the grand jury returned almost a year later) came far too late. The Court need not decide whether to formally adopt the ruse exception because, even if it did so, Mr. Penney cannot satisfy the requirements for its application.  Mr. Penney has not shown collusion between the state and federal authorities to detain him solely to prepare federal charges and so this argument fails.

Mr. Penney also moves to suppress all evidence obtained from a search of a residence located at 1229 Irwin Street in Aliquippa, Pennsylvania. Mr. Penney attacks the warrant for that search on two grounds.  First, he claims that, on its face, the affidavit in support of the warrant application could not support a finding of probable cause. Second, Mr. Penney argues that even if the affidavit does support a finding of probable cause, it only does so because it contains materially false statements.  Neither of Mr. Penney's arguments is ultimately persuasive.

The affidavit contains more than enough information to support a finding of probable cause.  And based on the Court's careful consideration of the entire record, including the testimony and evidence presented during the Court's *Franks* hearing, Mr. Penney failed to establish that the affidavit contains any false statements.

For these reasons, which are discussed more thoroughly below, the Court will deny both of Mr. Penney's motions.

## BACKGROUND

### I.   Procedural history.

Mr. Penney is charged in three counts in the superseding indictment. [ECF 501]. Count 1 charges that Mr. Penney participated in a conspiracy to violate 21 U.S.C. § 841. [*Id.*].  Count 9 charges Mr. Penney with possession with intent to distribute and/or distribution of cocaine, fentanyl, and heroin on June 19, 2018. [*Id.*]. And Count 10 charges Mr. Penney with possession,

- 2 -

brandishing, and discharge of a firearm in furtherance of a drug-trafficking crime on July 18, 2018.  [*Id.*].

Mr. Penney has moved to dismiss the indictment for preindictment delay.  [ECF 1805].  Mr. Penney has also moved to suppress all evidence obtained from the search of 1229 Irwin.  [ECF 1808].  Briefing on both motions is complete.

In connection with his suppression motion, Mr. Penney requested an evidentiary hearing under *Franks v. Delaware*, 98 S. Ct. 2674 (1978) to determine whether the warrant application contained false information that was material to the finding of probable cause.  [ECF 1808, ¶¶ 14-15].  In support of his request for a *Franks* hearing, Mr. Penney submitted a *pro se* declaration outlining the bases for his belief that the warrant affidavit contained allegedly false statements related to Mr. Penney's sale of controlled substances to an unidentified confidential informant. [ECF 1918].  Based on the averments in that declaration, the Court ordered a *Franks* hearing "limited to the presentation of evidence and testimony that prove the truth or falsity of ... the statements in paragraphs 26 through 30 of the warrant affidavit[.]"  [ECF 2255].

Those paragraphs of the warrant affidavit relate to a confidential informant making a controlled drug purchase from Mr. Penney on June 18, 2018:

> 26.    In June of 2018, CI#3 was utilized to make controlled purchases of Cocaine from PENNY in Aliquippa, Pennsylvania.  Each of these controlled purchases occurred under the direction and supervision of your Affiant.  The suspected narcotics will be submitted to the Pennsylvania State Police Crime Lab for further analysis.

> 27.    A controlled purchase is defined as a purchase of a controlled substance by a confidential informant who is acting at the request of law enforcement.  The CI is searched prior to and after the transaction for controlled substances and/or contraband.  If the CI's vehicle is used, it is searched for

- 3 -

controlled substances and/or contraband as well. The CI is provided with official funds to purchase the controlled substance. Surveillance of the CI is maintained as is reasonably possible by law enforcement authorities. After the transaction, the CI returns to law enforcement authorities and turns over the purchased controlled substance. This protocol was followed during all the controlled purchases described herein.

28.     Within the past forty-eight (48) hours, your Affiant and other Agents met with CI#3 at a pre-determined location. The CI was briefed and searched; no money, drugs or weapons were found on the CI#3' person or in the CI#3's vehicle.

29.     CI#3 contacted PENNY via cellular phone to arrange a controlled drug purchase of Cocaine. PENNY advised CI#3 to "meet on plan 12", which CI#3 knew to mean that CI#3 should go to the area of Wade Street in the City of Aliquippa, in an area labeled and known as "plan 12". You Affiant provided CI#3 with a known amount of pre-recorded funds obtained from the Pennsylvania Office of Attorney General.

30.     Your Affiant and other Agents left the location with CI#3. A short time later, CI#3 arrived in the area of Wade Street and Burton Street in the City of Aliquippa and waited for PENNY. Just prior to CI#3 arriving in the area, the surveillance team observed PENNY walking in the front door of 1229 Irwin Street, Aliquippa, Beaver County, Pennsylvania, 15001. The surveillance team then observed PENNY exit the residence within several minutes and begin walking to the location where CI#3 was waiting. The surveillance team then observed PENNY meet with CI#3 and make a visual hand to hand transaction with CI#3 on Wade Street. CI#3 then left the area, while PENNY walked back towards

Irwin Street.  A short while later, PENNY was observed walking back in the front door of 1229 Irwin Street, Aliquippa, Beaver County, Pennsylvania, 15001.  CI#3 returned to the meet location and relinquished a blue glove that contained a plastic baggie containing suspected powder Cocaine.  The substance was field tested and produced a positive response for Cocaine.  The CI related that he/she had dealt directly with PENNY while on Wade Street, giving him the confidential funds and receiving the Cocaine directly from PENNY.

[ECF 1808-1, ¶¶ 26-30 (fully sic'd)].

The Court held the *Franks* hearing on August 31, 2020.[1]  The hearing was held by videoconference based on the consent of all counsel and parties, including Mr. Penny.  [ECF 2412, 3:15-4:9, 41:19-22].  The Court heard testimony from three witnesses:  Special Agent Nathan Smith, Agent Ronald Hogue, and Keri Bozich.

After the close of the hearing, Mr. Penney filed two *pro se* declarations in further support of his motion to suppress in which he attempts to offer additional testimony.  [ECF 2355; ECF 2385].  The Court considers these submissions to be improper efforts to introduce testimony after the close of the hearing without being subjected to cross examination.  *See United States v. Denson*, No. 08-365, 2010 WL 3949869, at *2 (W.D. Pa. Oct. 7, 2010) (McVerry, J.) ("The government's attempt to remedy its decision to not call these officers as witnesses by submitting a post-hearing affidavit is not appropriate

---

[1] Before the hearing, Mr. Penney filed a motion for "access to any and all grand jury transcripts pertaining to the June 19, 2018 search" of 1229 Irwin "[i]n order to properly prepare for the examination and cross-examination of witnesses during the hearing on Mr. Penney's Motion to Suppress[.]"  [ECF 2252, ¶ 11].  However, none of the witnesses who testified during the hearing testified before the grand jury.  [ECF 2412, 9:1-7].  As a result, the parties agreed that Mr. Penney's motion was moot, and the Court denied it as such.  [*Id.* at 9:19-21].

and would deprive Defendant of his right to cross-examine these witnesses.  The affidavit is hereby STRICKEN and will not be considered by the Court in ruling on the Motion to Suppress.").  He also filed *pro se* additional exhibits for the Court's consideration.  [ECF 2335].  These exhibits were not admitted into evidence at the hearing.

## II.   Factual findings.

After considering the entire record, including all the evidence and testimony presented at the *Franks* hearing, the Court makes the following findings of fact.

### A.   The application for a warrant to search 1229 Irwin.

On June 19, 2018, Magisterial District Judge Janet Swihart authorized the application for a search warrant of the residence located at 1229 Irwin Street in Aliquippa based on her review of the affidavit prepared by Agent Scott Patterson.  [ECF 1808-1].

At the time of the affidavit, Agent Patterson was a narcotics agent with the Pennsylvania office of Attorney General working in the Bureau of Narcotic Investigations and Drug Control.  [ECF 1808-1, ¶ 1].  Agent Patterson had over ten years of experience investigating drug trafficking in the Western District of Pennsylvania.  [*Id.* at ¶¶ 1-2]. Agent Patterson received extensive specialized training in law enforcement and investigative techniques relevant to his work.  [*Id.* at ¶¶ 3-7].

Mr. Penney was the subject of an investigation into drug trafficking in Aliquippa.  [*Id.* at ¶ 20].  When Agent Patterson drafted the affidavit, Mr. Penney had been convicted of three prior drug-trafficking offenses.  [*Id.* at ¶ 20].

The affidavit set forth several bases for believing that a search of 1229 Irwin would reveal evidence of criminal activity.  [*Id.* at ¶¶ 21-31].  In April 2018, a confidential informant, advised that Mr. Penney was a "source of Cocaine in Beaver County, more specifically the City of Aliquippa, Pennsylvania."  [*Id.* at ¶ 23].  That same confidential informant also related that through June 2018, he or she had "known [Mr. Penney] to utilize a 'blue

house' on Irwin Street near the corner of Burton Street in Aliquippa to sell cocaine from." [*Id.* at ¶ 23]. Agent Patterson asserted that he knew "that residence to be 1229 Irwin Street, Aliquippa, Beaver County, PA 15001 which is blue in color." [*Id.*].

In May 2018, a second confidential informant also advised that Mr. Penney was a source of cocaine in the "Beaver County area of Pennsylvania." [*Id.* at ¶ 24]. That same confidential informant further stated that he or she had bought cocaine from another individual named "Sterling" at 1229 Irwin, and that "Sterling" told the confidential informant that Mr. Penney had been "stashing" cocaine and a grey substance believed to be heroin at the residence. [*Id.*].

In June 2018, a third confidential informant stated that Mr. Penney was a source of cocaine in the Aliquippa area. [*Id.* at ¶ 25]. That informant claimed to have bought cocaine from Mr. Penney "over 30 times." [*Id.*].

All three confidential informants were known to be reliable sources of information. [*Id.* at ¶¶ 23-25]. Agent Patterson also claimed that law enforcement separately corroborated all information provided by these confidential informants. [*Id.*].

Law enforcement used the third confidential informant to make controlled purchases of cocaine from Mr. Penney. [*Id.* at ¶ 26]. These controlled purchases occurred under the direction and supervision of Agent Patterson. [*Id.*]. One such controlled purchase was made on June 18, 2018.

## B.   The June 18, 2018, controlled purchase.

Before the controlled purchase, the confidential informant was "briefed and searched; no money, drugs or weapons were found on the [confidential informant's] person or in the [confidential informant's] vehicle." [ECF 1808-1, ¶ 28]. The confidential informant then contacted Mr. Penney on his cellular phone to arrange the transaction. [*Id.* at ¶ 29]. Mr. Penney told the confidential informant to "meet on plan 12," which the confidential informant understood to mean to go to the area of Wade

Street in Aliquippa. [*Id.*]. Agent Patterson provided the confidential informant with a "known amount of pre-recorded funds obtained from the Pennsylvania Office of Attorney General." [*Id.*].

Agent Hogue was one of the law-enforcement agents tasked with surveilling the controlled purchase between Mr. Penney and the confidential informant. [ECF 2412, 44:14-17]. Agent Hogue was assigned to "stationary" surveillance on 1229 Irwin. [*Id.* at 44:21-45:7]. Agent Hogue testified that he parked "just past Burton on Irwin." [*Id.* at 46:15-18]. Agent Hogue was on the right-hand side of the street. [*Id.* at 47:10-12]. From his vantage, Agent Hogue testified that he "could see the side of the house and anything that would go up and down the steps from the street." [*Id.* at 47:19-21]. Agent Hogue testified that he observed Mr. Penney get out of a car and then enter and exit 1229 Irwin just before walking up Irwin towards the pre-arranged location of the controlled purchase. [*Id.* at 47:25-48:15].

Ms. Bozich, a private investigator for Mr. Penney, testified that in July 2020, she travelled to the area of the controlled purchase "to determine observation ability from various parked locations." [*Id.* at 58:15-22, 59:20-23]. Ms. Bozich testified that from the approximate location of where Agent Hogue was parked on Irwin Street, she believed that it would be "very unlikely" he could see the front of 1229 Irwin. [*Id.* at 61:1-5]. But she conceded that she "wasn't down that far on Irwin Street" to confirm for certain. [*Id.*].

Agent Hogue at first misidentified 1229 Irwin as a "brick" house on the corner of Irwin and Burton. [*Id.* at 50:2-8]. Agent Hogue later testified that he couldn't remember precisely what the house looked like because it had been two years since the surveillance. [*Id.* at 51:24-52:2]. Agent Hogue repeatedly testified, however, that he would have correctly identified the house in the report he completed following the surveillance detail. [*Id.* at 52:2, 52:11-12, 53:18-24]. Agent Hogue did not witness the controlled purchase. [*Id.* at 52:15-16].

That's where Agent Smith's surveillance picked up. Agent Smith was parked in an unmarked surveillance

- 8 -

vehicle on the corner of Wade Street and Burton throughout his surveillance. [*Id.* at 15:14, 16:14, 16:24-17:1]. Agent Smith could not see the front of 1229 Irwin from his position. [*Id.* at 19:13-14]. The controlled purchase occurred on the corner of Wade and Burton behind Agent Smith's vehicle. [*Id.* at 17:12-14].

An unidentified agent alerted Agent Smith over the radio that Mr. Penney was observed leaving 1229 Irwin and heading towards his location. [*Id.* at 17:25-18:2]. Mr. Penney walked past Agent Smith's vehicle on his way to the location of the controlled purchase. [*Id.* at 20:11-19]. Agent Smith observed Mr. Penney clutching a blue glove in his right hand. [*Id.* at 23:17-21, 32:12-18].

Agent Smith testified that the controlled purchase occurred "[a]pproximately 15 feet to the left of [his] vehicle just behind [him]." [*Id.* at 20:5-7]. While testifying at a preliminary hearing in the Court of Common Pleas of Beaver County, Agent Smith previously stated that he was 65 feet from the transaction. [*Id.* at 27:24-28:9].

Agent Smith turned around in his vehicle to observe the transaction. [*Id.* at 20:8-10]. Agent Smith could see the transaction. [*Id.* at 23:12-13]. He saw "Mr. Penney hand the confidential informant the blue object I earlier observed him clutching in his right hand." [*Id.* at 23:19-21]. But he did not witness any exchange of currency. [*Id.* at 23:22-23].

Following the transaction, Agent Smith watched Mr. Penney travel back down Burton Street towards Irwin Street. [*Id.* at 24:18-20]. Mr. Penney turned onto Irwin Street and that's when Agent Smith lost visual of him. [*Id.*]. Agent Smith later prepared a surveillance report detailing his observations. [*Id.* at 37:19-38:1].

After the controlled purchase, the confidential informant met with law enforcement and surrendered a blue glove that contained a plastic baggie with suspected powder cocaine inside. [ECF 1808-1, ¶ 30]. The powder was field tested and produced a positive response for cocaine. [*Id.*]. The confidential informant "related that he/she had dealt directly with [Mr. Penney] while on Wade

Street, giving him the confidential funds and receiving the Cocaine directly from [Mr. Penney]." [*Id.*].

### C.    The search of 1229 Irwin.

Law-enforcement officials executed the search warrant on 1229 Irwin.  Quantities of fentanyl, heroin, and cocaine, as well as other evidence, were found at that location.  Mr. Penney seeks to suppress that evidence.

### D.    Mr. Penney's arrest and subsequent indictment.

State authorities arrested Mr. Penney on August 26, 2018.  That arrest stemmed from state charges that were filed in four cases in the Court of Common Pleas of Beaver County.[2]  [ECF 1805-1].  At the time of his arrest, Mr. Penney was also on federal supervised release for his conviction at 2:03-cr-229.  As a result of these new charges, the government filed supervised-release violation petitions in May 2018 and June 2018.

Assistant United States Attorney Ross Lenhardt was assigned to handle Mr. Penney's federal supervised-release violation petitions.  [ECF 1879, p. 17].  On March 13, 2019, AUSA Lenhardt emailed the state prosecutor, Chad Parks, informing him that a federal indictment could be returned against Mr. Penney for the conduct at issue in his pending state cases.  [ECF 1805-4].  That email outlined Mr. Penney's significant sentencing exposure should the grand jury return an indictment and a jury convict him.  [*Id.*].  AUSA Lenhardt then advised that if Mr. Parks was "able to resolve the cases in Beaver County, I will close my case regarding the pending drug charges.  Then [Mr. Penney] will only face federal prosecution for the Supervised Release violation." [*Id.*].  AUSA Lenhardt also conveyed the need for expediency since he already had "essentially all of the materials necessary for a Federal

---

[2]    Those four cases included:  *Commonwealth of Pennsylvania v. Dana Lamar Penney*, Nos. CP-04-CR-0000214-2019,   CP-04-CR-0000215-2019,   CP-04-CR-0000216-2019,   and   CP-04-CR-0000217-2019 (Butler C.C.P.).  [ECF 1805, ¶¶ 7-8, 10].

Indictment and intend[ed] to act prior to the current Beaver County trial date" set for July 2019.  [*Id.*].

Ultimately, Mr. Penney declined to resolve his pending state cases through a plea agreement—instead, he moved to dismiss the charges.  [ECF 1879, p. 17].  After that decision, the Beaver County District Attorney's Office withdrew their plea offer.  A federal grand jury then returned the superseding indictment in this case on June 19, 2019.  [ECF 501].  Two days later, federal authorities executed an arrest warrant on Mr. Penney.  [ECF 819].  Mr. Penney remained in state custody from his August 2018 arrest until after his federal indictment in June 2019. [ECF 1879, p. 17].

After the return of the superseding indictment, the District Attorney of Beaver County petitioned for *nolle prosequi* in all four cases pending against Mr. Penney. [ECF 1805-1].

## DISCUSSION & ANALYSIS

### I.   The Court will deny Mr. Penney's motion to dismiss.

Mr. Penney argues that the charges against him in the superseding indictment should be dismissed because the delay in the return of the indictment violated his rights under the Sixth Amendment and the Speedy Trial Act. [ECF 1805].  Mr. Penney claims that this delay prejudiced him because it led to "the withdrawal of a plea offer and the inability to proffer a key witness essential to [his] defense."  [*Id.*].  Mr. Penney is incorrect that the charges against him should be dismissed.

Under the Sixth Amendment, a criminal defendant has a right "to a speedy and public trial."  U.S. Const., Amend. VI.  This right attaches to federal defendants at the time of the defendant's federal arrest or indictment, whichever comes first.  *See United States v. Bailey-Snyder*, 923 F.3d 289, 293 (3d Cir. 2019).

Federal criminal defendants also have a related statutory right under the Speedy Trial Act.  Section 3161(b) of the Act requires that "[a]ny information or indictment

charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  If the government fails to file the information or indictment within thirty days, "such charge against that individual contained in such complaint shall be dismissed or otherwise dropped."  18 U.S.C. § 3162(a)(1).

The grand jury returned the superseding indictment on June 18, 2019.  [ECF 501].  Federal authorities arrested Mr. Penney under those charges on June 21, 2019.  [ECF 819].  On its face, the record does not suggest any violation of Mr. Penney's rights under the Speedy Trial Act.

Mr. Penney, however, has a different perspective. He argues that the government's time to file the superseding indictment began to run either from the date of his arrest by state authorities (*i.e.,* August 26, 2018) or the date the federal government "became actively involved" in his state prosecutions through AUSA Lenhardt's email to the state prosecutor (*i.e.,* March 19, 2019).  [ECF 1805, ¶ 2].  According to Mr. Penney, if the Court uses either of these alternative dates, then the superseding indictment would have come too late, and the government would have violated his rights under the Speedy Trial Act.  [*Id.*].

The Court is not persuaded that either of Mr. Penney's proposed alternative dates started the government's clock to file an indictment in this case.

"Where, as here, the defendant is arrested on state charges and later indicted on federal charges, the right to a speedy trial in the federal case is triggered by the federal indictment, and the time period under consideration commences on that date."  *United States v. Costello*, 720 F. App'x 120, 122 (3d Cir. 2018) (cleaned up).  Generally, "an arrest on state charges does not engage the speedy trial protection for a subsequent federal charge."  *Id.* at 122-23 (cleaned up).  "This is true even if the federal charge shares the same facts as the state case."  *Id.* at 123 (citation omitted).  "The state arrest and state prosecution do not control the speedy trial analysis because the state and federal governments are separate sovereign entities, and the actions of one cannot typically bind the other."  *United*

*States v. Rose*, 365 F. App'x 384, 389 (3d Cir. 2010) (citation omitted).

The Third Circuit's decision in *Rose*, which involved substantially identical facts, is instructive. There, as is the case here, the defendant was first arrested and charged in Pennsylvania state court on drug and gun charges. *Id.* at 386. Five months into the state prosecution, an AUSA for the district sent a letter to the defendant's attorney stating that the defendant "would not be prosecuted federally if he pled guilty to drug and weapons charges in state court[.]" *Id.* The state prosecutor and the defendant's attorney attempted unsuccessfully to resolve the case for 14 months after the AUSA sent his letter. *Id.* The defendant then moved to dismiss his state charges and a grand jury returned a federal indictment adopting the state charges for federal prosecution. *Id.*

The defendant moved to dismiss the federal indictment, arguing that the delay in the return of the indictment violated his Sixth Amendment speedy trial rights. *Id.* The Third Circuit rejected this claim, holding that the defendant's "federal speedy trial rights attach only at the time of a federal arrest or institution of a formal federal criminal charge." *Id.* at 389 (cleaned up). The Court finds the Third Circuit's rationale equally persuasive in this case.

As was the case in *Rose*, AUSA Lenhardt's March 13 email "is obviously not an indictment and does not otherwise qualify as a formal charge." *Id.* at 389. That's because it "neither resulted in [Mr. Penney's] incarceration under federal authority nor initiated federal criminal proceedings against him." *Id.* Instead, the email "is simply a representation that the federal government would forbear pursuing charges against [Mr. Penney], provided that he satisfactorily resolved his criminal liability in state court." *Id.* Despite Mr. Penney's claims to the contrary, nothing in the email obligated "the federal government to prosecute [him] if he failed to reach a state plea deal, and the U.S. Attorney's Office could have chosen to take no prosecutorial action after state plea negotiations turned sour." *Id.* Indeed, when AUSA Lenhardt wrote the email, "while the odds of indictment were surely high, the government had no guarantee that federal prosecutors

would successfully persuade a grand jury to indict [Mr. Penney]." *Id.*

Thus, "[b]ecause the [email] neither charged [Mr. Penney] nor caused him to be placed in federal custody, it is properly viewed as nothing more than a representation that federal authorities would refrain from attempting to prosecute him if he pled guilty in state court, not as a formal accusation." *Id.*

To avoid this conclusion, Mr. Penney argues that "the provisions of the Speedy Trial Act can be triggered by something other than actual federal custody and federal arrest, i.e. any restraint resulting from federal action." [ECF 1805, ¶ 24 (cleaned up)]. Specifically, Mr. Penney claims that "[a] state arrest …may trigger the Speedy Trial Act 'when the government has knowledge that an individual is held by state authorities solely to answer to federal charges.'" *Costello*, 720 F. App'x at 123 (quoting *United States v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005)). This principle, recognized in other Circuits, is known as the "ruse exception."[3]

The Third Circuit, despite several opportunities, has "yet to adopt the 'ruse' exception." *Id.*; *see also United States v. Dyer*, 325 F.3d 464, 468 (3d Cir. 2003) ("We do not

---

[3] Many of the cases adopting and applying the ruse exception are in the context of the federal government civilly detaining individuals for immigration purposes. *See, e.g.*, *United States v. Pasillas-Castanon*, 525 F.3d 994, 997-98 (10th Cir. 2008); *United States v. De La Pena-Juarez*, 214 F.3d 594, 597 (5th Cir 2000); *United States v. Pena-Carrillo*, 46 F.3d 879, 883 (9th Cir. 1995). It is less common that the case involves incarceration under state authority. And, at least one circuit refused to apply the exception in that context because of the independent sovereignty of the states. *See United States v. Alvarado-Linares*, 698 F. App'x 969, 974 (11th Cir. 2017) (rejecting application of ruse exception to arrests or detentions under state law by state officials "[b]ecause state authorities at all times held sovereign discretion as to how they separately might handle their own prosecution or non-prosecution for state offenses").

at this time need to decide whether to recognize the ruse exception."); *United States v. Brown*, 445 F. App'x 474, 479 (3d Cir. 2011) ("Our Circuit has yet to recognize a 'ruse exception' to the Speedy Trial Act's federal arrest requirement."). The Third Circuit has explained, however, that if the ruse exception exists, to qualify, the defendant must make a showing of collusion or present evidence that the detention was "for the sole or primary purpose of preparing for federal criminal prosecution." *Costello*, 720 F. App'x at 123 (cleaned up). The Court need not predict whether the Third Circuit would adopt the ruse exception because even assuming such an exception exists, Mr. Penney has not met his burden of proving collusion or that the primary purpose of the state's detention of him was to prepare for a federal criminal prosecution.

On the present record, the state had every intention of fully prosecuting Mr. Penney on his state charges. As Mr. Penney concedes in his motion, the Beaver County District Attorney filed formal charges in four separate actions, presented evidence and witness testimony at a preliminary hearing, participated in a judicial pretrial conference, and engaged in plea negotiations. [ECF 1805, ¶¶ 7-8, 10, 18, 21]. AUSA Lenhardt's email doesn't establish that the state prosecution was merely a "ruse," either. If anything, that email was simply an offer to Mr. Penney to avoid federal prosecution. It appears to the Court that the state fully intended on prosecuting Mr. Penney up until the point that a federal grand jury returned the superseding indictment in this case.

An "arrest is not necessarily federal merely because agents and state officers cooperate with one another or because the state prosecution does not proceed apace." *Brown*, 445 F. App'x at 479. But that's essentially all that Mr. Penney has asserted—that cooperation between state and federal authorities is de facto proof that the state was acting at the direction of the federal government when it arrested him. Cooperation is not the same as collusion.

Finally, Mr. Penney "requests a hearing to determine the nature and scope of federal involvement between his arrest on state charges on August 26, 2018 and his arrest on federal charges on June 21, 2019." [ECF 1805. ¶ 27]. But "a defendant seeking an evidentiary hearing

must allege facts, sufficiently definite, specific, detailed and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Brown*, 445 F. App'x at 479 (cleaned up).  Mr. Penney has not done so, and thus he isn't entitled to a hearing.  Beyond that, there is nothing from the current record that would suggest a hearing is necessary.  For example, there is no dispute of fact here as to the state's conduct in pursuing criminal charges at the state level against Mr. Penney.  *See United States v. Fattah*, 858 F.3d 801, 811 (3d Cir. 2017) ("Fattah has failed to show the existence of a material dispute of fact capable of resolution at an evidentiary hearing.").  That alone defeats Mr. Penney's claim under the ruse exception.

## II.     The Court will deny Mr. Penney's motion to suppress.

Mr. Penney makes two arguments in support of his request to suppress all evidence obtained from the search of 1229 Irwin.  First, Mr. Penney argues that the affidavit in support of the search warrant for 1229 Irwin is insufficient on its face because it is "fraught with conclusory allegations and factually unsupported statements attempting to link Mr. Penney's alleged criminal conduct to the location to be searched." [ECF 1813, p. 5].  Second, Mr. Penney argues that, even if the affidavit is enough to establish probable cause on its face, it contains false statements that are material to that finding of probable cause. [*Id.* at p. 6].

The government counters by claiming that Mr. Penney doesn't have standing to challenge the search of 1229 Irwin. [ECF 1879, p. 40].  But even if he does, the government argues that the four corners of the affidavit are enough to support a finding of probable cause. [*Id.* at pp. 45-51].  Finally, the government argues that even if the search warrant were not supported by probable cause, "it was not so lacking that the agents could not rely upon it in good faith." [*Id.* at pp. 51-53].

The Court finds that Mr. Penney has standing to challenge the search of 1229 Irwin, but that the warrant was supported by probable cause and Mr. Penney has not met his burden of establishing the falsity of any material

statement in the affidavit in support of the warrant application.

### A.   Mr. Penney has standing to challenge the search of 1229 Irwin.

At the outset, the government challenges whether Mr. Penney has standing to challenge the search of 1229 Irwin.  That's because, according to the government, Mr. Penney has "failed to establish that he had a reasonable expectation of privacy at 1229 Irwin Street on June 19, 2018." [ECF 1879, p. 40].  The Court disagrees.

"Defendants bear the threshold burden to establish standing to raise a Fourth Amendment challenge." *United States v. Ginyard*, No. 17-254, 2019 WL 257937, at *5 (W.D. Pa. Jan. 18, 2019) (Conti, J.) (citation omitted).  A "defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply point to specific evidence in the record which the government has presented and which establishes his standing." *Id.* (cleaned up).  Put simply, a defendant can meet his or her burden by relying only on evidence given by the government.  *See id.*; *see also United States v Meran*, No. 16-222, 2017 WL 4803927, at *10 (W.D. Pa. Oct. 23, 2017) (Conti, J.).

That's precisely what Mr. Penney has done here by pointing to statements on the face of the warrant application and the affidavit in support that establishes his expectation of privacy.  The warrant application identifies Mr. Penney as an "occupant" of 1229 Irwin. [ECF 1808-1].  And the affidavit alleges that Mr. Penney was known to "utilize a 'blue house' on Irwin street near the corner of Burton Street in Aliquippa" that Agent Patterson later identified as 1229 Irwin by "stashing" both "cocaine and a grey substance in a plastic baggie" there. [ECF 1808-1, ¶¶ 23-24].  The government cannot both allege that Mr. Penney had a significant enough connection to 1229 Irwin to justify the issuance of a search warrant and then later claim that Mr. Penney doesn't have a reasonable expectation of privacy in that same location.  *See Ginyard*, 2019 WL 257837, at *5 ("The February 27, 2017 search warrant listed both Ginyard and Andre Hamm … as 'owner, occupant or possessor' of the premises and the

application included Hamm's statement to officers that Ginyard had been staying at the Hershey residence for a day or two. … The Court concludes that Ginyard has standing to challenge the Hershey search.") (citation omitted).

Mr. Penney has standing to challenge the search of 1229 Irwin.

### B.    The warrant was supported by probable cause.

Turning now to the motion to suppress, Mr. Penney first argues that Agent Patterson's affidavit failed to establish probable cause because it turned on uncorroborated statements made by confidential informants and the controlled purchases detailed in it took place too far from 1229 Irwin to establish a connection between the residence and the drug trafficking activity. [ECF 1813, pp. 5-6]. Mr. Penney's arguments are not well-taken.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause …." U.S. Const., Amend. IV. That said, "[p]robable cause is not a high bar." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (cleaned up). Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (cleaned up). This "is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). It deals "with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *United States v. Laville*, 480 F.3d 187, 196 (3d Cir. 2007) (cleaned up). "For this reason, the [Supreme] Court has eschewed any rigid demand that specific tests be satisfied and has instead prescribed a totality-of-the-circumstances approach to the probable cause determination." *Dempsey v. Bucknell University*, 834 F.3d 457, 469 (3d Cir. 2016) (cleaned up).

- 18 -

In reviewing probable-cause determinations made by an issuing judge, "the role of the courts is not that of the much-maligned 'Monday morning quarterback' whose critiques are made possible only by the benefits of hindsight." *Id.* In fact, "[t]he Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided." *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

Applying this deferential standard here, Agent Patterson's affidavit more than adequately established probable cause to search the residence at 1229 Irwin.

The affidavit details information provided by three confidential informants that implicated Mr. Penney in recent drug distribution activity. One confidential informant "advised that [Mr. Penney] is a source of Cocaine in Beaver County, more specifically the City of Aliquippa, Pennsylvania." [ECF 1808-1, ¶ 23]. That same informant relayed that he or she knew Mr. Penney to "utilize a 'blue house' on Irwin Street near the corner of Burton Street in Aliquippa to sell cocaine from." [*Id.*]. A second confidential informant stated that he or she received cocaine from 1229 Irwin and that Mr. Penney had been "'stashing' Cocaine and a grey substance in a plastic baggie" at the residence. [*Id.* at ¶ 24]. A third confidential informant advised law enforcement that Mr. Penney was a source of cocaine in the Aliquippa area. [*Id.* at ¶ 25].

Mr. Penney broadly dismisses these statements as "uncorroborated hearsay." But "an affidavit relying on hearsay is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented." *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983) (cleaned up). There was a substantial basis to credit the statements of the confidential informants here because all these informants were known sources of reliable information to law enforcement. [ECF 1808-1, ¶¶ 23-25]; *see, e.g.*, *United States v. Vaughn*, 498 F. App'x 168, 170 (3d Cir. 2012) (finding probable cause existed for search warrant in part because the "affidavit cite[d] a known informant as telling the investigating officers that

- 19 -

Coleman hid weapons at Vaughn's residence"); *United States v. Williams*, No. 05-381, 2006 WL 3052313, at *5 (W.D. Pa. Oct. 23, 2006) (Hardiman, J.) ("Thus, the affidavit, containing the information provided by a known informant with a solid informational foundation on this occasion and substantial reliability on a prior occasion, was sufficient to support the magistrate's probable cause determination.").

The statements were further corroborated by law enforcement observing one of the confidential informants conducting controlled purchases of cocaine from Mr. Penney, including one such purchase within forty-eight hours of filing the affidavit. [ECF 1808-1, ¶ 26-30].

At that controlled purchase, law enforcement observed Mr. Penney enter and exit 1229 Irwin just before he provided a blue glove that concealed a plastic baggie containing cocaine to the confidential informant. [*Id.* at ¶ 30]. Afterwards, the confidential informant "related that he/she had dealt directly with" Mr. Penney and gave "him the confidential funds" in exchange for the cocaine. [*Id.*].

Mr. Penney argues that this controlled purchase cannot support a finding of probable cause because it "occurred outside of and some distance from the searched residence, which happens to be occupied by a relative of Mr. Penney." [ECF 1813, p. 5]. But this argument ignores that the affidavit connects the controlled purchases to 1229 Irwin by asserting that "the surveillance team observed [Mr. Penney] walking in the front door of 1229 Irwin" and then "observed [Mr. Penney] exit the residence within several minutes and begin walking to the location" of the eventual exchange. [ECF 1808-1, ¶ 30]. That observation was enough to establish a connection between 1229 Irwin and the drug trafficking activity. *See Bridges v. Torres*, 809 F. App'x 69, 72 (3d Cir. 2020) (finding probable cause to search a residence existed where "the surveillance team observed the CI conduct two controlled buys from McClain and followed him as he returned to 12 Spruce Street immediately after the transaction. It was thus reasonable for Torres to rely on information provided by the CI.") (citation omitted).

For further corroboration, the affidavit also summarized Mr. Penney's historical and contemporary criminal record, including his multiple drug trafficking convictions. While "a defendant's criminal history is not dispositive," it is "relevant to the probable cause inquiry." *United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009). That's because "a person of reasonable caution would take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause." *Id.* (cleaned up). And here Mr. Penney had pled guilty to possession with intent to distribute drugs on three prior occasions and had several other drug-related arrests. [ECF 1801-1, ¶ 20].

Based on all these facts, Agent Patterson, a law-enforcement official with extensive experience and specialized training in narcotics investigations, believed that there was a reasonable probability that evidence of drug trafficking would be found at 1229 Irwin. A magistrate judge may "give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found[.]" *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (cleaned up).

Keeping in mind the Court's "deferential" standard of review, and considering the totality of the circumstances presented to the issuing magistrate judge, the Court finds that the information in the affidavit provided a substantial basis to conclude that evidence of drug dealing was likely to be found at 1229 Irwin. *See, e.g.*, *Untied States v. Walker*, 776 F. App'x 784, 786 (3d Cir. 2019) ("Walker conducted the drug transactions in a car parked in the driveway behind 6735 Woodstock, rendering his home a more likely repository of his drug-related paraphernalia. … He was seen leaving the house immediately before selling drugs to the informant, supporting the inference that the drugs were being stored there.") (cleaned up); *United States v. Thornton*, 559 F. App'x 176, 179 (3d Cir. 2014) ("There was sufficient evidence to link the residence at 855 Brill Street to Thornton's drug activities here. Police officers observed Thornton engage in several drug transactions, supporting the notion that he was, in fact, a drug dealer. He was seen entering and exiting this dwelling immediately before and after selling drugs on two separate

occasions. These facts, combined with Officer Myers's opinion that evidence of drugs was likely to be found in the residence, provide a substantial basis from which the issuing magistrate could conclude that evidence of drug dealing was likely to be found at 855 Brill Street.").

### C.    Mr. Penney did not establish the falsity of any material statement in the affidavit.

Besides his facial challenge, Mr. Penney also argues that information or statements relied on in the affidavit were false or made with reckless disregard for the truth. [ECF 1813, p. 6]. Based on Mr. Penney's *pro se* declaration, the Court ordered a *Franks* hearing to examine the truth or falsity of the statements in paragraphs 26 through 30 of the affidavit (*i.e.*, the averments relating to the controlled purchase on June 18, 2018). [ECF 2255].

At a *Franks* hearing, the defendant must prove by a preponderance of the evidence "(1) that the affiant knowingly or deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination."  *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citations omitted). Omissions and assertions are made "with reckless disregard" for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting. *Id.*  "[T]he fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause."  *United States v. Williams*, No. 17-246, 2019 WL 2150661, at *16 (W.D. Pa. May 17, 2019) (Conti, J.) (citing *United States v. Frost*, 999 F.2d 737, 742-43 (3d Cir. 1993)).

During such a hearing, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."  *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (Gibson, J.) (citations omitted).

During Mr. Penney's *Franks* hearing, and consistent with the Court's order as to the scope of the hearing, he focused his challenge on the truth of the averments about the June 18, 2018, controlled purchase. According to Mr. Penney, that controlled purchase was the critical link between Mr. Penney's alleged drug sales and 1229 Irwin. [ECF 2412, 63:18-20]. Mr. Penney specifically challenged: (1) Agent Hogue's observation of Mr. Penney exiting from 1229 Irwin Street before the controlled purchase; and (2) Agent Smith's observations before and during the hand-to-hand exchange with the confidential informant.

Based on the Court's careful consideration of the record, including the Court's credibility determinations of the testifying witnesses, the Court concludes that Mr. Penney has not satisfied his burden of proving the falsity of any material statement in the affidavit.

### 1.    Agent Hogue's observations.

Agent Hogue participated in the surveillance of the controlled purchase on June 18, 2020. Agent Hogue testified that his surveillance was "stationary" and located roughly across the street from 1229 Irwin. From his vantage, Agent Hogue testified that he "could see the side of the house and anything that would go up and down the steps from the street." [ECF 2412, 47:19-21]. Agent Hogue also testified that he observed Mr. Penney enter and then exit 1229 Irwin before Mr. Penney travelled to the prearranged location of the controlled purchase. [*Id.* at 49:5-9].

Mr. Penney objects to one specific aspect of Agent Hogue's testimony. That is, during his testimony, at first, Agent Hogue identified 1229 Irwin as a "brick house" on the corner of the intersection of Irwin and Burton. [*Id.* at 50:7-8]. But 1229 Irwin is not a brick house and it is not on the corner. It is a house with blue siding that is one house from the corner. Later in his testimony, though, Agent Hogue clarified that because of the passage of time, he couldn't be sure what the house looked like at the time of his surveillance. [*Id.* at 51:24-52:2]. After all, the day of this surveillance happened more than two years before the hearing. Agent Hogue testified that he had done numerous other surveillance operations in that area since

then.  [*Id.* at 45:23-46:1 ("I probably did surveillance in the City of Aliquippa a thousand times since then.")].  He was, however, quite sure that he accurately recorded the information in the report that he drafted after his surveillance.  [*Id.* at 52:11-12 ("He walked out of – walked in and walked out of the house with the address that is listed in the report.")].  Agent Hogue drafted that report "[s]hortly after the operation was complete."  [*Id.* at 53:8].

The Court finds credible Agent Hogue's testimony that he correctly identified, in his written report, the house he observed Mr. Penney enter and exit before and after the controlled purchase.  Agent Hogue's conflicting memory of 1229 Irwin being a "brick house" appeared to the Court to be a byproduct of the passage of time.  He was never shown during the hearing his report of the incident to refresh his recollection.  But he was unwavering in his belief that he would have properly recorded the information his report.  In fact, Agent Hogue testified that on the day of his surveillance he was provided the address of the house to be surveilled and focused his attention on the house at that address.  [*Id.* at 53:9-17].  The Court sees no reason to doubt this testimony.

The testimony of Ms. Bozich that, in her estimation, it was "unlikely" that Agent Hogue could see 1229 Irwin from his vantage, does not change the analysis.  From the Court's review of the map of the area—which was introduced as Exhibit 2 during the hearing—it looked likely that Agent Hogue could see enough to support the statements in the warrant affidavit.  He may not have been able to literally see a person go directly in and out of the door of 1229 Irwin, but he could have certainly seen a person walk up the steps from the sidewalk in the direction of the front door to the house, and then back out to the street.  The Court doesn't find it to be false for Agent Hogue to have inferred that Mr. Penney went in and out of the door of 1229 Irwin, when he saw Mr. Penney walk up the steps from the house as he entered and exited.  *See Blakeney v. United States*, 191 F.3d 451 (6th Cir. 1999) ("It is apparent that Sadowski logically and in good faith concluded that Anderson had placed the bag in the dumpster, even though he did not actually see him do so. And while hindsight tells us that Agent Sadowski's inference was undoubtedly the correct one, the question

- 24 -

before us is whether his statement that he had actually *observed* Anderson place the bag in the dumpster is enough for a substantial preliminary showing of deliberate or reckless falsehood. Our review of Agent Sadowski's testimony and the relevant case law lead us to conclude that it was not.") (unpublished table opinion); *United States v. Sinclair*, No. 13-20829, 2017 WL 3977888, at *3 (E.D. Mich. Sept. 11, 2017) ("Logical inferences cannot constitute false or misleading statements.").

Thus, Mr. Penney's challenge to this information is unpersuasive.

### 2.      Agent Smith's observations.

Mr. Penney next objects to Agent Smith's observations of Mr. Penney's interaction with the confidential informant during the controlled purchase. Mr. Penney zeroes in on allegedly inconsistent testimony from Agent Smith about how far away he was from the transaction. In one version of Agent Smith's testimony, he claims that he was 12 to 15 feet away; in another version, he claims that it was more like 65 feet away.

Whether he was 15 feet away or 65 feet away, Agent Smith was clear about the following key facts: (1) that he observed Mr. Penney walk closely past his vehicle clutching a blue glove in his right hand [ECF 2412, 32:14-18]; (2) he then saw Mr. Penney "hand the confidential informant the blue object [he] earlier observed him clutching in his right hand" [*id.* at 23:19-21]; and (3) following this exchange, he observed Mr. Penney walk toward 1229 Irwin before he eventually lost sight of him [*id.* at 24:16-20]. Based on his demeanor and the clarity of his answers, the Court finds Agent Smith's testimony about these key facts to be credible. Furthermore, Mr. Penney offered no evidence that even if Agent Smith were 65 feet away, this would have been too far to make the observations that Agent Smith claims he made, including, specifically, Mr. Penney handing the confidential informant a blue object.

This finding is crucial because, at the hearing, Mr. Penney did not offer any evidence or testimony to challenge the allegations from the affidavit that, following the

exchange, the confidential informant "returned to the meet location and relinquished a blue glove that contained a plastic baggie containing suspected powder Cocaine" and "related that he/she had dealt directly with [Mr. Penney] while on Wade Street, giving him the confidential funds and receiving the Cocaine directly from [Mr. Penney]." [ECF 1808-1, ¶ 30]. Agent Smith's observations coupled with the averments about what happened following the exchange are, as Mr. Penney's counsel concedes, the "crux that allows the government to gain access to the residence located at 1229 [Irwin]." [ECF 2412, 63:11-12].

In sum, after carefully considering the testimony and evidence offered at the hearing, the Court sees no reason to doubt the accuracy of Agent Smith's testimony or the corresponding averments in the affidavit that track that testimony. As a result, Mr. Penney's second challenge also fails.[4]

Given that Mr. Penney has failed to meet his burden of establishing that the Court must excise or correct any of the statements in the affidavit, the Court's earlier finding that the warrant was supported by probable cause stands undisturbed. The Court will not suppress any of the evidence obtained as the result of the search of 1229 Irwin.[5]

---

[4] Even if the Court considered Mr. Penney's improper *pro se* post-hearing submissions, it would not change the outcome. In those submissions, Mr. Penney reiterates the argument of counsel that Agent Smith gave inconsistent testimony regarding his distance from the controlled purchase [ECF 2235]; notes neither Agent Hogue nor Agent Smith testified they saw Mr. Penney riding a motorcycle around the time of the controlled purchase, which Mr. Penney claimed he did [*id.*]; notes that Agent Hogue misidentified 1229 Irwin [ECF 2385]; and challenges other ancillary details in Agent Smith's and Agent Hogue's testimony [ECF 2235; ECF 2385]. None of these claims convince the Court that either Agent Hogue's or Agent Smith's testimony was false.

[5] Because the Court finds that the warrant was supported by probable cause, it need not and does not address the government's argument that "even if the search warrant

## <u>CONCLUSION</u>

For these reasons, the Court will deny Mr. Penney's motion to dismiss the superseding indictment [ECF 1805] and motion to suppress [ECF 1808]. An appropriate order consistent with this Memorandum Opinion follows.

DATED this 13th day of October, 2020.

BY THE COURT:


*/s/ J. Nicholas Ranjan*
United States District Judge

---

was not supported by probable cause, it was not so lacking that the agents could not rely upon it in good faith." [ECF 1879, p. 51].